----------------------------------------------------- x
:
JOHN JOSEPH TRUNK              :                3:19 CV 216 (RMS)
:
V.                           :
:
COMMISSIONER             :
OF SOCIAL SECURITY      :              DATE: FEB. 6, 2020
:
----------------------------------------------------- x

### RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR IN THE ALTERNATIVE, MOTION FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION FOR AN ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying the plaintiff disability insurance benefits ["SSDI"] and Supplemental Security Income benefits ["SSI"].

I.     ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for SSDI on January 18, 2016 and SSI on February 1, 2016, claiming that he had been disabled since July 7, 2015, due to severe alcohol use disorder, anxiety, depressive disorder, cirrhosis of the liver, thrombocytopenia, intracranial hemorrhage, hepatitis, peptic ulcer disease and cognitive defects. (Doc. No 10, Certified Transcript of Administrative Proceedings, dated March 7, 2019 ["Tr."] 69-70; *see* Tr. 230-39). The plaintiff's applications were denied initially and upon reconsideration (Tr. 68-98), and on January 29, 2018, a hearing was held before Administrative Law Judge ["ALJ"] Louis Bonsangue, at which the plaintiff and a vocational expert testified. (Tr. 30-67). On February 27, 2018, the ALJ issued an unfavorable decision denying the plaintiff's claim for benefits (Tr. 7-24). On March 21, 2018, the plaintiff requested review from the Appeals Council (Tr. 229), and on December 20, 2018, the Appeals

Council denied the request, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

On February 14, 2019, the plaintiff filed his complaint in this pending action (Doc. No. 1), and on February 19, 2019, the parties consented to the jurisdiction of a United States Magistrate Judge. (Doc. No. 8). This case was transferred accordingly. On June 18, 2019, the plaintiff filed his Motion to Reverse the Decision of the Commissioner and for Remand (Doc. No. 12), with a Statement of Material Facts (Doc. 12-3), and a brief in support. (Doc. 12-1 ["Pl.'s Mem."]). On August 19, 2019, the defendant filed his Motion to Affirm (Doc. No. 13), with a brief in support ["Def.'s Mem."], and his Statement of Material Facts. (Doc. No. 13-1). On September 4, 2019, the plaintiff filed a reply brief. (Doc. No. 14).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner and for Remand (Doc. No. 12) is DENIED, and the defendant's Motion to Affirm (Doc. No. 13) is GRANTED.

II.     FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statement of Facts. (Doc. Nos. 12-3, 13-1). Though the Court has reviewed the entirety of the medical record, it cites only the portions of the record that are necessary to explain this decision.

The plaintiff testified before the ALJ on January 29, 2018. (Tr. 30). On the date of the hearing, the plaintiff was fifty-four years old, single, and living with his cat. (Tr. 36-37). He graduated from high school and worked as a roofer, a security guard, and in "dietary service" in the dining hall at the University of Connecticut in Storrs. (Tr. 40-42). Most recently, the plaintiff

served as a volunteer and as a part-time employee with dining services at a hospital. (Tr. 44-45; *see* Tr. 258).

The plaintiff testified that he had "trouble walking" because he fractured his femur in 2016 when he tripped over his cat. (Tr. 46). He walked with a limp, which he described as "uncomfortable." (Tr. 49-50). He could sit for long periods of time but had trouble standing. (Tr. 47). He did not take any pain medication (*id.*), but he used a cane to balance himself when navigating a lot of stairs, which he did when he last attended a Yard Goats minor league baseball game, or when walking to the mailbox in the winter. (Tr. 51-52).

The plaintiff had regular ultrasounds for his cirrhosis and endoscopies for his esophageal varices. (Tr. 48). He had a brain hemorrhage in 2015, following which he was in a rehabilitation facility. (Tr. 53). After his brain aneurysm, he would mumble when he spoke, which the ALJ noticed at the hearing. (Tr. 57-59).

He testified that he wrote everything down because he had issues with his memory. (Tr. 54). He also said he could not "lift anything" and could not "push stuff around" or "take the trash out." (Tr. 56). He had no difficulties getting along with others and believed that anger was "a waste of emotion" and was "not going to get you anywhere." (Tr. 56).

The plaintiff attributed his inability to reach overhead with both his arms to his "[s]leep methods" because he would "fall[] asleep on the couch a lot . . . ." (Tr. 50). His sleep was "erractic[.]" (Tr. 58). When he was home, he would read, watch television, and play with his cat. (Tr. 58). The plaintiff's mother drove him to his medical appointments and his Alcoholics Anonymous ["AA"] meetings, did his laundry, and cooked his meals. (Tr. 38, 59).

The vocational expert testified that the plaintiff's past work as a dietary aide and as a kitchen helper, were both classified as medium work, and his past work as a security guard, was

classified as light work. (Tr. 61-62). The ALJ posed several hypotheticals to the vocational expert at the plaintiff's hearing. In response to the first, the vocational expert testified that an individual who was capable of light level work but limited to lifting and carrying up to twenty pounds occasionally and ten pounds frequently, who could frequently or occasionally climb ramps and stairs and could balance, stoop, kneel, crouch or crawl, but could never climb ropes, ladders or scaffolds and who must avoid concentrated exposure to temperature extremes, wetness or humidity, and was limited to performing simple, routine, repetitive tasks for two-hour periods with regular breaks and infrequent changes in the work routine could not perform the plaintiff's past work. (Tr. 62-63). Such an individual, however, could perform light, unskilled work as a maid, assembler and cashier. (Tr. 63). When the ALJ added the limitation of "occasional overhead reaching bilaterally[,]" the vocational expert testified that, even with that limitation, an individual could perform these same three jobs. (Tr. 64). An additional limitation requiring unscheduled breaks throughout the day "such that they're going to be off task more than ten percent every day on a consistent basis" would preclude work. (Tr. 64). A sit/stand option, "meaning there's a chair or stool at the workstation and the person can sit and stand in the chair at-will" would preclude the work of a cashier and a maid and would reduce by fifty percent the number of jobs available for a small parts assembler. (Tr. 65).

## III.    THE ALJ'S DECISION

Following the five-step evaluation process,[1] the ALJ found that the plaintiff met the insured status requirements through December 31, 2020 (Tr. 12), and that the plaintiff did not engage in

---

[1] First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141

substantial gainful activity since his alleged onset date of July 7, 2015. (Tr. 12, citing 20 C.F.R. §§ 404.1571 *et seq.* and 416.971 *et seq.*).

At step two, the ALJ found that the plaintiff had the following severe impairments: cirrhosis of the liver, esophageal varices, fracture of the lower limb, "status post open reduction internal fixation (ORIF) right garden half femoral neck fracture," organic mental disorder, depression, and alcohol substance addiction disorder. (Tr. 12-13, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

The ALJ concluded at step three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, and specifically, did not meet or medically equal the criteria of listing 1.02 (Major Dysfunction of a Joint), listing 5.05 (Chronic Liver Disease), and listings 12.02 and 12.04 regarding the plaintiff's mental impairments. (Tr. 13-15).

The ALJ concluded that the plaintiff had the residual functional capacity ["RFC"] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; he could frequently balance, stoop, kneel, crouch and crawl; he had to avoid concentrated exposure to extreme heat,

---

(1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

extreme cold, wetness, humidity, loud noise, vibration, fumes, odors, dusts games, poor ventilation, and moving parts, and even moderate exposure to unprotected heights; and, he could perform simple, routine repetitive tasks for two-hour periods in an eight-hour day, but could tolerate only infrequent changes in work routine. (Tr. 15).

At step four, the ALJ concluded that the plaintiff was unable to perform his past relevant work as a dietary aide and as a security guard; however, at step five, the ALJ found that the plaintiff could perform other work in the national economy, including the work of a maid, assembler and cashier. (Tr. 22-24, citing 20 C.F.R. §§ 404.1569, 404,1569(a) and 416.969(a)). Accordingly, the ALJ concluded that the plaintiff was not under a disability at any time from July 7, 2015, through February 27, 2018, the date of his decision. (Tr. 24, citing 20 C.F.R. §§ 404.1520(g) and 416.920(g)).

IV.     STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and

conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.    DISCUSSION

The plaintiff argues that the ALJ erred by failing to analyze the treating physician opinions of Dr. Alicia M. Dodson and Felicia Seay, APRN (Pl.'s Mem. at 3-7), and, failing to give specific reasons for rejecting their opinions which included limitations not accounted for in the ALJ's RFC (*id.* at 7-14). Specifically, the plaintiff asserts that the underlying record is consistent with the treating opinions, and, although the ALJ accorded the greatest weight to the opinions of the State agency consultants, those consultants did not review nearly 800 pages of medical records, nor did they review the opinions of Dr. Dodson and APRN Seay.  (*Id.* at 12-14). Moreover, the plaintiff contends that, even if the ALJ properly relied on the opinions of the non-examining consultants, he failed to acknowledge the limitations that were contrary to his RFC.  (*Id.* at 14-15). Additionally, the plaintiff argues that the ALJ failed to consider the plaintiff's "stellar work history" in his credibility assessment.  (*Id.* at 15-17).

The defendant counters that the ALJ properly noted the entries in the medical record that did not support the treating physician opinions and made an RFC finding and a disability

determination that were consistent with the available evidence in the record. (Def.'s Mem. at 10-16). Additionally, the defendant argues that the ALJ adequately considered the plaintiff's work history. (*Id.* at 17-18).

A.   THE ALJ'S RFC DETERMINATION IS SUPPORTED BY THE MEDICAL OPINIONS IN THE RECORD

As discussed above, the ALJ concluded that the plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except that he could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds; he could frequently balance, stoop, kneel, crouch and crawl; he had to avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, loud noise, vibration, fumes, odors, dusts games, poor ventilation, and moving parts, and even moderate exposure to unprotected heights; and, he could perform simple, routine repetitive tasks for two-hour periods in an eight-hour day, but could tolerate only infrequent changes in work routine. (Tr. 15).

The RFC "is an assessment of 'the most [the disability claimant] can still do despite [his or her] limitations.'" *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013) (summary order) (quoting 20 C.F.R. § 404.1545(a)(1)). "Although RFC is assessed using 'all the relevant evidence in [the] case record,' 20 C.F.R. § 404.1545(a)(1), the medical opinion of a treating physician is given 'controlling weight' as long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is not inconsistent with the other substantial evidence in the record." *Tankisi*, 521 F. App'x at 33 (quoting 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)).

There were two opinions from the plaintiff's treating providers. The first opinion was from APRN Seay, dated November 10, 2016. (Tr. 447-48). APRN Seay reported that the plaintiff had an impaired gait, mobility, and short-term recall, generalized weakness, a seizure disorder,

cirrhosis of the liver, and major depression. (Tr. 447). She opined that he could sit, stand, walk, stoop and climb infrequently, meaning "very little if at all on some days[,]" and could occasionally, meaning from "little up to 1/3 of an 8-hour workday" lift between six and ten pounds and infrequently lift twenty pounds. (Tr. 447). According to APRN Sealy, the plaintiff could never use his hands for fine manipulation, could infrequently use his hands for gross manipulation, and could occasionally raise his arms over his shoulders. (Tr. 447). She concluded that the plaintiff's impairments caused moderate pain, and he would be off-task 40% of an eight-hour workday. (Tr. 448). He needed to elevate his legs due to pain or swelling, he had to lie down and take unscheduled breaks during an eight-hour workday, he required an assistive device to ambulate, and he suffered from poor memory recall as a side effect from his medication. (Tr. 448).

On March 1, 2017, Dr. Dodson co-signed a second statement completed by APRN Seay in which she stated that the plaintiff suffered from pain in his right hip, identified by an abdominal ultrasound and "EGD findings." (Tr. 1229, 1232). The plaintiff's medications caused dizziness and nausea, and he required the use of an assistive device due to pain and weakness. (Tr. 1230-31). The providers opined that the plaintiff could occasionally, meaning up to one-third of the workday, be around moving machinery and be exposed to marked changes in temperature and humidity and to dust; he could drive up to one-third of the day and could rarely be exposed to unprotected heights. (Tr. 1231).

As an initial matter, though APRN Seay authored both opinions, the second opinion bore a co-signature of Dr. Dodson. The treating physician rule requires that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well- supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess,* 537

F.3d at 128 (quoting 20 C.F.R. § 404.1527(d)(2) [now (c)(2)]). Only "acceptable medical sources" can provide medical opinions and are considered treating sources whose opinions are entitled to controlling weight. *See* 20 C.F.R. §§ 416.927(a)(2), (c).[2] An APRN is not considered an "acceptable medical source[,]" 20 C.F.R. §§ 404.1592, 416.913(d), therefore, the treating physician rule does not apply to her opinion. *Bushey v. Colvin*, 552 F. App'x 97, 97-98 (2d Cir. 2014) (summary order). That said, the opinion evidence from "other sources[,]" such as APRNs, may be used to show the "severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work[.]" Social Security Ruling ["SSR"] 06-03p, 2006 WL 2329939, at *2 (S.S.A. Aug. 6, 2006). Thus, the ALJ, as he did in this case, must consider such opinions and explain his reasons for the weight he assigns to them.

Additionally, when an APRN's opinion is co-signed by a physician, the ALJ must address the import of that signature when determining the weight to assign to the opinion under the treating physician rule. *See Baldwin v. Colvin*, No. 15 CV 1462 (JGM), 2016 WL 7018520, at *10 (D. Conn. Dec. 1, 2016) (citing *Johnson v. Colvin*, No. 14 CV 1446 (MPS), 2016 WL 659664, at *3 (D. Conn. Feb. 28, 2016) (remanding when it was "not clear whether the ALJ evaluated [the opinion of the APRN, co-signed by a physician] under the treating physician rule."); *Payne v. Astrue*, No. 10 CV 1565 (JCH), 2011 WL 2471288, at *5 (D. Conn. Jun. 21, 2011) (holding that, when the physician assistant's opinion is co-signed by a physician, the ALJ "should have explained whether or not he considered these opinions to be the opinions of an appropriate medical source, and if not, then why[]")).

---

[2] All citations refer to the sections of the Code of Federal Regulations that were effective on the date that the ALJ issued his decision in this case; Revisions to the C.F.R. that became effective on March 27, 2017 only apply to applications filed on or after that date.

Although the plaintiff argues that Dr. Dodson "actually examined [the] plaintiff[,]" there are no treating records supporting that statement, and, when asked about Dr. Dodson, the plaintiff testified that Dr. Dodson was his doctor "in the hospital[,]" and he was "pretty sure [he] never met her[.]" (Tr. 51). Under these circumstances, "the ALJ was free to discount the assessment accordingly in favor of the objective findings of other medical doctors." *Genier v.* Astrue, 298 F. App'x 105, 108-09 (2d Cir. 2008) (summary order); *see Goulart v. Colvin*, No. 3:15 CV 1573 (WIG), 2017 WL 253949, at *4 (D. Conn. 2017) *(citing *Perez v. Colvin*, 2017 WL 253949, at *4 (D. Conn. Apr. 17, 2014), report and recommendation adopted, No. 3:13 CV 868 (JCH), 2014 WL 4852848 (D. Conn. Sept. 29, 2014) (holding that when there are no records or other evidence to show that the medical provider treated the claimant, the APRN's opinion does not constitute the opinion of the physician)).

When the ALJ "do[es] not give the treating source's opinion controlling weight," as happened here, he must "explicitly consider" the factors listed in 20 C.F.R. § 404.1527(c)(2), including "'(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."' *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam)). Unless after "'a searching review of the record'" the reviewing court is "assure[d] . . . that the 'substance of the treating physician rule was not transversed,'" the ALJ's failure to apply these factors requires the remand. *Estrella*, 925 F.3d at 96 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In this case, the ALJ, not only provided "good reasons" for discounting these opinions, he also considered the factors required under the treating physician rule.

APRN Seay reported in her assessment that she treated the plaintiff every two to three months since April 26, 2016. (Tr. 1229). However, there are no underlying treatment records authored by APRN Seay, thus, there are no records showing the nature and length of her treating relationship with the plaintiff. Moreover, as discussed above, there are no records evidencing Dr. Dosdon's treatment relationship with the plaintiff. Additionally, as the ALJ thoroughly discussed, he assigned "little weight" to both opinions because they were inconsistent with the medical evidence of record. *See Estrella*, 2019 WL 6837767, at *4; *Halloran*, 362 F.3d at 33; *see* 20 C.F.R. § 404.1527(c)(2) (stating that the ALJ must "comprehensively set forth" "good reasons" for the "determination or decision for the weight we give [the claimant's] treating source's medical opinion"). In his decision, the ALJ addressed both the plaintiff's mental and physical ailments and incorporated limitations for each in his RFC.

As to the plaintiff's mental impairments,[3] the ALJ discussed the treatment notes from each provider. (Tr. 17-19). The ALJ accurately noted that the plaintiff's memory loss was considered

---

[3] Because the plaintiff's claims of error largely address the ALJ's consideration of his mental limitations, the Court will not embark on a detailed recitation of the medical records relating to his physical impairments. The Court notes, however, that the records of the plaintiff's physical impairments also support the ALJ's findings that his conditions improved as he stopped drinking.

Specifically, the plaintiff was treated in June 2015 for a "gluteal hematoma with anemia secondary to acute blood loss[.]" (Tr. 368-69). He was prescribed a rolling walker. (Tr. 362-64). At that time, his strength was "3+/5 throughout extremities[,]" and his ability to stand was assessed as "[p]oor plus." (Tr. 359). He required minimal to moderate assistance with a wheeled walker to ambulate 40 feet; he was unsteady and required frequent assistance to prevent falling. (Tr. 359-60). He was admitted to Ingraham Manor for extended rehabilitation, including physical therapy. (Tr. 360). A year later, the plaintiff tripped over his cat and fractured his right hip. (Tr. 801; *see* Tr. 798-800, 806-10). He was admitted to the hospital and underwent an open reduction and internal fixation of a "right Garden ½ femoral neck fracture of the right hip with Synthes cannulated screws." (Tr. 438, 811; *see* Tr. 980-89). Upon discharge, the plaintiff was referred to APRN Seay. (Tr. 1138, 1140). On June 7 and 8, 2016, he complained of left foot/ankle pain and was diagnosed with a left ankle sprain; he also had bruising on his left side. (Tr. 988-89, 991, 993). Eleven days later, the plaintiff reported doing well; he had "painless range of motion of the hip." (Tr. 436-37). At that time, he had been sober for one year. (Tr. 635). He continued to report improvement on July 15, 2016, and he was able to place full weight on his right lower extremity. (Tr. 433). The plaintiff had no hip pain during his follow up with his orthopedist's office. (Tr. 434). He had "no specific restrictions" and could "continue to work on range of motion exercises and strengthening." (*Id.*).

The plaintiff was diagnosed with cirrhosis of the liver in August 2015, (Tr. 395; *see also* Tr. 730-31 (8/11/16 (ultrasound confirming cirrhosis), 569-70 (2/2/17 (same), Tr. 461-63, 1227-28 (9/7/17 (same)), and was treated for

mild, and his overall condition had improved. The plaintiff received regular care from Dr. Peter Bloom, whose treatment records reflected consistent improvement when the plaintiff stopped drinking. To be sure, the plaintiff's cognitive deficits were noted throughout the record, and were referenced as well by the ALJ, who appropriately accounted for these limitations in his RFC finding.

Dr. Bloom first saw the plaintiff on August 17, 2015; he noted that the plaintiff's "cognitive status [was] chronically impaired . . . [the plaintiff] [did] recall some details but he seem[ed] to go off on tangents and his speech and thought process [were] not always organized." (Tr. 325; *see generally* Tr. 344). Dr. Bloom stated that the plaintiff's "[c]ognitive impairment [was] possibly multifactorial. He ha[d] encephalopathy [brain disease, damage of malfunction] with hyperammonemia [excess ammonia in the blood] and cognitive impairment with memory impairment." (Tr. 325). Upon examination, Dr. Bloom found "obvious cognitive impairment. [The plaintiff's] thought process and speech [was] somewhat tangential, although he [was] responsive and answer[ed] questions in a monotone affect." (*Id.*).

On September 22, 2015, Dr. Bloom noted mild cognitive impairment, likely multifactorial, with some memory impairment. (Tr. 328). The plaintiff reported that he had been sober for five months and that his mind was "a bit more clear." (*Id.*). Dr. Bloom diagnosed the plaintiff with alcoholic liver disease with cirrhosis, portal hypertension with hepatic encephalopathy, and anemia. (*Id.*). He noted that "[t]here [was] some altered mentation with cognitive impairment and

---

pancytopenia (reduced levels of all blood cells), hepatic dysfunction and low copper levels. (Tr. 374). When the plaintiff was seen for his pancytopenia on June 15, 2016, he reported that it had been one year since he stopped drinking. (Tr. 635). A review of his systems revealed only "[m]alaise[.]" (*Id.*).

flat affect[,]" although he was "not sure if this [was] his baseline personality or whether or not there [was] continue[d] mild hepatic encephalopathy." (Tr. 329).

On November 18, 2015, the plaintiff complained of intermittent and mild memory loss, described as an inability to recall new names, recent conversations, or recent events. (Tr. 341). His cognitive examinations, however, showed improvement and were within the normal range. (Tr. 341-42).  At that time, he was able to care for his personal needs independently. (*Id.*). Alcoholic dementia was not suspected. (Tr. 342).  Six days later, the plaintiff denied feelings of depression and anxiety; his mood was stable, and he was able to care for his personal needs independently. (Tr. 349).   On December 8, 2015, Dr. Bloom noted that the plaintiff was improving "clinically with each visit" now that he was sober.  (Tr. 330-31, 346-48). "[O]verall, [he was] doing quite well."  (Tr. 343).

On April 22, 2016, the plaintiff underwent an initial mental health assessment; he complained of anxiousness due to his recent discharge from Ingraham Manor. (Tr. 489, 492). His mood was anxious, his judgment was poor, and his insight was fair on mental status examination. (*Id.*). His long-term goal was to maintain his sobriety. (Tr. 491). Dr. Kashmer Zablan ordered therapy services for six months to prevent relapse or hospitalization and to improve his level of functioning. (Tr. 492).

On April 23, 2016, the plaintiff underwent a psychological evaluation with Sean Hart, Psy.D. in connection with his application for benefits. (Tr. 424-31). He reported suffering an intracranial hemorrhage three and a half to four years earlier, which required brain surgery; thereafter, he had to re-learn how to write, walk, and practice his speech. (Tr. 425). He described himself as "never really . . . the same" since that surgery. (Tr. 426).

He presented as somewhat "tangential," "a bit rambling" at times, and difficult to pin down for information. (*Id.*). He was clearly dysphoric and depressed with low energy on examination, but he denied feeling depressed. (*Id.*). Dr. Hart found that the plaintiff "clearly ha[d] some attentional problems and it [was] noteworthy that his capacity for attention/immediate memory was one standard deviation below the mean." (*Id.*).[4] Dr. Hart repeated multiple questions because the plaintiff could not "retain the information in his mind." (Tr. 427). Dr. Hart diagnosed the plaintiff with major depressive disorder, moderate; persistence depressive disorder with anxious distress; and alcohol use, severe, in early partial remission. (Tr. 430). He opined that the plaintiff was very dependent on his family and others to help care for him, as, at that time, he was living in a supervised apartment, had visiting nurses come every day to administer his medications, had staff from Ingraham Manor check on him at least every other day, and had his mother take him to all of his appointments. (*Id.*). Dr. Hart recommended a representative payee, or at least some minimal supervision around his money. (Tr. 431). The ALJ assigned "partial weight" to this opinion in that it was "generally consistent with the medical evidence of record." (Tr. 21).

In April 2016, the plaintiff started attending group therapy sessions to maintain his sobriety; his attendance was irregular until August 2016. (Tr. 519-35, 537, 689, 691-703, 706-08; *see* Tr. 525-26). The plaintiff reported his intent to work on getting "acclimated to [the] community and back to work." (Tr. 538).

---

[4] The Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV) revealed a full-scale IQ of 73, which placed his cognitive functioning in the borderline range of intelligence. (Tr. 426). His Perceptual Reasoning performance suggested his non-verbal reasoning and novel situations responses were impaired, and his ability to focus and concentrate were also deemed impaired based on his Working Memory score. (*Id.*). As far as his Processing Speed, he worked "extremely" slowly and performed very poorly on this index; he worked in an uncoordinated manner and had visual motor difficulties. (*Id.*). Dr. Hart assessed the plaintiff as having "severely impaired" performance on coding, and his WAIS-IV scores were "considered a valid and reliable estimate of [the plaintiff's] current cognitive functioning." (Tr. 427-28).

In January and February 2017, the plaintiff's mood was euthymic; he had linear thought process and felt motivated to stop drinking alcohol. (Tr. 494-97). In late January and early February, his counselor noted that the plaintiff needed "outpatient therapy to provide support, monitor mood and increase coping skills with goals to maintain stabilized mood and decrease substance abuse." (Tr. 495-96). On February 15, 2017, however, his counselor noted that the plaintiff had "reached maximum benefit from therapy at [that] time." (Tr. 494). He was discharged from counseling on February 27, 2017. (Tr. 525-26). At that time, the plaintiff reported drinking one or two times each week, but that he "no longer needed therapy." (*Id.*). The ALJ appropriately noted that the plaintiff's "mood improved with treatment, he was able to decrease his use of alcohol, and he was discharged in February 2017 because he reached the maximum benefit from treatment. (Tr. 19).

In August 2016, because the plaintiff was feeling better, Dr. Bloom asked him if he was going to look for a new job. (Tr. 1185, 1204). He informed Dr. Bloom that he was trying to obtain disability, and Dr. Bloom remarked that "the indication for this is unclear," noting that the plaintiff had a hip fracture earlier in the year and that this was surgically corrected and healed well. (Tr. 1185-86, 1204-05). Dr. Bloom added, "He appears quite functional and I asked him to reconsider [applying for disability] as I believe he would benefit from returning to work." (Tr. 1186, 1205). Also, as the ALJ noted in his decision, in August 2016, the plaintiff's cirrhosis and mental status had improved after he had stopped consuming alcohol. (Tr. 17; *see* Tr. 1177). The plaintiff did not exhibit any depressive symptoms, and he reported that he was "back to work." (Tr. 1177). Similarly, in January 2017, Dr. Bloom observed that the plaintiff was sober for fourteen months at that point, was doing well from a clinical standpoint and was volunteering at Ingraham Manor. (Tr. 1183). Dr. Bloom observed the plaintiff's mental status was "back to baseline." (*Id.*). Dr.

Bloom's physical and neurological examinations of the plaintiff were normal. (Tr. 1183-84). The plaintiff reported feeling well in January 2017 and September 2017. (Tr. 1183, 1202, 1236).

The ALJ appropriately considered Dr. Hart's opinion, the plaintiff's therapy records, and Dr. Bloom's consistent treatment records and his repeated reports of improvement, as well as his opinion that the plaintiff "was functioning quite well" such that he "advised him to reconsider filing for disability and instead look for work." (Tr. 18); *see Genier*, 298 F. App'x at 108-09 (noting that "the ALJ was free to discount [a treating provider's] assessment accordingly in favor of the objective findings of other medical doctors[]"). Although the plaintiff argues that the ALJ did not incorporate all limitations detailed in the record, an "'ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision,' because particularly where faced with conflicting medical evidence, the ALJ is 'entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.'" *Montelli v. Saul*, No. 18 CV 1780 (JAM), 2019 WL 6837767, at *4 (D. Conn. Dec. 19, 2019) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record.") (additional citations omitted).

The ALJ also appropriately discounted APRN Seay's opinions on the ground that they were inconsistent with the opinions of the State agency psychological consultants, Robert Decarli, PsyD and Susan Uber, PhD, whose opinions the ALJ assigned "great weight[]" as they were "generally consistent with the medical evidence of the record[,]" and the consultants are "highly qualified" psychologists who are "expert(s) in Social Security disability evaluation." (Tr. 20-21 (citing 20 C.F.R. §§ 404,1527(f), 416.927(d)(5)).

Dr. Decarli completed his Mental Residual Capacity Assessment and Psychiatric Review Technique on April 27, 2016. (Tr. 78-79, 89-90, 93-94). He opined that the plaintiff was not significantly limited in his ability to carry out very short and simple instructions, maintain a regular schedule and attendance, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and make simple work-related decisions. (Tr. 78-79). Additionally, he opined that the plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruptions, and could handle work for two-hour periods with adequate attention, concentration and pace. (Tr. 79). Dr. Uber's opinion was identical to Dr. Decarli's opinion, but she added that the plaintiff would "do best in an unchanging job comprised of simple [routine and repetitive tasks]." (Tr. 110; *see* Tr. 108-110).

In his RFC assessment, the ALJ limited the plaintiff to performing simple, routine repetitive tasks for two-hour periods in an eight-hour day, with infrequent changes in work routine. (Tr. 15). Additionally, in his decision, the ALJ concluded that the plaintiff had moderate limitations in the areas of understanding, remembering, or applying information, and concentrating, persisting, or maintaining pace, but that his condition improved when he stopped consuming alcohol. (Tr. 14). The ALJ also noted that, in February 2017, the plaintiff had "achieved maximum benefit from treatment for his mental/alcohol condition" and that he got "along fine with authority figures and ha[d] never been fired or laid off for problems getting along with others." (Tr. 14). The "ALJ has discretion to discount . . . opinion evidence [from APRN Seay, who is an "other source[,]"] if it is contradicted by objective medical evidence and opinions of medical consultants." *Rivera v. Berryhill*, No. 3:16-CV-01842 (JAM), 2018 WL 1521824, at *5 (D. Conn. Mar. 28, 2018) (citing *Figueroa v. Astrue*, No. 04 CV 7805 (KMK)(LMS), 2009 WL

4496048, at *12 (S.D.N.Y. 2009). Thus, the ALJ did not err in his treatment of the State agency consultants' opinions.

The plaintiff also argues that the ALJ erred in relying on the State agency medical consultant's opinions because they did not review records submitted after their March 9 and September 7, 2016 opinions were issued. (Pl.'s Mem. at 13). "[T]he mere addition of medical records after a State agency medical examiner's review does not render the examiner's opinion invalid." *Carthron-Kelly v. Comm'r of Soc. Sec.*, No. 15 CV 0242 (GTS/WBC), 2017 WL 9538379, at *6 (N.D.N.Y. Sept. 25, 2017). The medical opinions may still constitute "substantial evidence if [they] are consistent with the record as a whole." *Marozzi v. Berryhill*, No. 6:17 CV 6864 (MAT), 2019 WL 497629, at *7 (W.D.N.Y. Feb. 8, 2019) (citation omitted). In this case, the ALJ's decision is consistent with the treatment records, and the opinions offered by Drs. Decarli and Uber were not outdated. A medical opinion is only outdated if subsequent treatment records demonstrate that the plaintiff's condition has deteriorated. *Calvin v. Saul*, No.5:18 CV 060 (CFH), 2019 WL 2869681, at *7 (N.D.N.Y. July 3, 2019) (citations omitted). To the contrary, the subsequent treatment records in this case reflected the plaintiff's improvement.

The plaintiff also claims that the ALJ did not include in his RFC all of the limitations assessed by the State agency medical consultants as they also opined that the plaintiff would have "occasional problems with prolonged concentration and sustained pace." (Pl.'s Mem. at 14-15 (citing Tr. 79, 110)). According to the plaintiff, the ALJ facially adopted the opinions of the Agency's psychological consultants but omitted limitations from those opinions without explaining his reasons for not including them in his RFC. (Pl.'s Mem. at 15; Doc. No. 14 at 1). The plaintiff argues that this error "is not harmless" in light of the vocational expert's testimony that an individual who took unscheduled breaks and who was off task more than ten percent of the

workday on a consistent basis would be unable to maintain competitive employment. (*Id.*). The ALJ, however, did include this limitation by finding that the plaintiff could only perform simple, routine and repetitive work for a maximum of two hours at a time. *See Matta*, 508 F. App'x at 56 (finding no error in the ALJ's conclusion that the plaintiff had "moderate difficulties in concentration, persistence and pace" and "moderate difficulties in social functioning that limit [him] to simple, routine, low-stress, and unskilled tasks, which involve no more than minimal contact with co-workers, supervisors and the general public").

Moreover, a person who can perform simple work in an isolated environment for two-hour periods in an eight-hour workday, and who has "occasional problems with prolonged concentration and sustained pace," is not necessarily someone who would be off task ten percent of the time. *Burke v. Berryhill*, No. 3:17 CV 0537 (AWT), 2018 WL 4462364, at *1-2 (D. Conn. Sept. 18, 2018). The plaintiff cannot rely on difficulties in concentration and sustained pace; he must provide evidence that he would be off task ten percent or more of the time. *Id.* The ALJ appropriately rejected the "other source" opinion from APRN Seay that the plaintiff would be off-task 40% of an eight-hour workday (*see* Tr. 448), as there was no support in the record for this severe limitation. "[I]f a job provides '[n]ormal work breaks and meal periods,'" an eight-hour workday would be "'split . . . into approximately two hour periods[.]'" *Id.* at *1-2 (quoting *Swain v. Colvin*, No. 14 CV 869, 2017 WL 2472224, at *3 (W.D.N.Y. Jun. 8, 2017)). Such a schedule would allow for simple work to be performed for two-hour periods in an eight-hour day for someone with "occasional problems with prolonged concentration and sustained pace[.]" *Id.* at *1-2.

The ALJ also considered the plaintiff's activities of daily living. At the hearing in January 2018, the plaintiff testified that his mother continued to act as a caregiver to him; she would clean his apartment, cook him food, and drive him to/from doctors' appointments. (Tr. 38). The

pharmacy would sort his medications for him and tell him what time they needed to be taken. (Tr. 39). The plaintiff testified that he had a poor memory and had to write everything down, even when he only had to remember just one or two things; he attributed his memory problems to his brain surgery. (Tr. 38; 54). In light of these limitations, the ALJ concluded that the plaintiff had a moderate limitation in his ability to adapt or manage himself, noting that he did care for his cat, read, watch television, live alone, and had "no problems" with personal care. (Tr. 14). Additionally, the ALJ noted that the plaintiff could sweep, walk for a quarter of a mile, use public transportation when going out, go out alone, shop, go places without being reminded, pay attention for one hour at a time, handle stress and routine changes okay and respond well to written and spoken instructions. (Tr. 15; *see* Tr. 285).

Additionally, the ALJ did not err in assigning little weight to the opinions of APRN Seay and Dr. Dodson that the plaintiff was unable to work due to his need for an assistive device to ambulate. (*See* Tr. 448, 1229-32). The plaintiff was prescribed a rolling walker in June 2015 when he was discharged from Hartford Hospital for a "gluteal hematoma with anemia secondary to acute blood loss." (Tr. 362-64, 368-69). But, as he testified, he did not regularly need an assistive device to ambulate. As he explained, the last time he used a cane was in the summer when he went to a ball game, and he would only use a cane when going up a lot of stairs, or when he walked to his mailbox in the snow because he was nervous about slipping. (Tr. 51-52). There is no support in the record for the conclusion that the plaintiff required a cane to ambulate.

In light of the ALJ's detailed recitation of the opinions in the record, his consideration of the treatment relationship of APRN Seay and Dr. Dodson, the medical evidence in the record documenting consistent improvement, and the ALJ's consideration of the plaintiff's activities of daily living, the Court concludes that the ALJ's RFC assessment was supported by substantial

evidence. On the record before the Court, the ALJ did not err in how he weighed the treating physician's opinions.

B.  CREDIBILITY ASSESSMENT: CONSIDERATION OF WORK HISTORY

Lastly, the plaintiff argues that the ALJ erred in failing to consider the plaintiff's "excellent work history, with 33½ years of covered earning prior to his alleged disability date, along with attempting to work part-time in 2017."  (Pl.'s Mem. at 16 (citing Tr. 250-51, 258).  The plaintiff is "not suggesting that the credibility factor of work history necessarily carries more weight than the other factors, or that his stellar work history entitled him to enhanced credibility;" rather, the plaintiff argues that the ALJ must consider the plaintiff's willingness to work, and, in this case, the ALJ did not.  (Pl.'s Mem. at 17).

It is well settled that it is the function of the Commissioner, and not the reviewing court, "to appraise the credibility of witnesses, including the claimant."  *Carroll v. Sec'y of Health and Hum. Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  "'[A] good work history may be deemed probative of credibility[,]' but a claimant's work history is 'just one of many factors' appropriately considered in assessing credibility."  *Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (summary order) (quoting *Schaal v. Apfel,* 134 F.3d 496, 502 (2d Cir. 1998)) (additional citation omitted).  In this case, just as in *Wavercak*, the ALJ "reasonably relied on contrary evidence in the record, including the extensive testimony and treatment notes from numerous physicians[,]" to support his RFC assessment.  *Id.* at 94.  The ALJ considered Dr. Bloom's notation that the plaintiff's treatment record and medical history did not suggest that the plaintiff should apply for disability benefits as he was showing strong signs of improvement. (Tr. 18; *see* Tr. 1186, 1205, 1236).  Dr. Bloom also noted that the plaintiff was looking for work and was volunteering.  (*Id.*).  Additionally, the ALJ appropriately relied upon the plaintiff's statement of his daily activities

which included caring for his cat, reading, watching television, shopping and attending to his personal grooming. (Tr. 14-15; *see* Tr. 285). The ALJ was aware of the plaintiff's long work history and considered that history when he concluded that the plaintiff's RFC prevented him from performing the demands of his past work. Accordingly, the ALJ did not err in his credibility assessment. *See Wavercak*, 420 F. App'x at 94 (finding no error when the ALJ did not reference the claimant's good work history in his decision, given that the substantial evidence of the record supported the ALJ's determination).

## VI.   CONCLUSION

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 12) is DENIED, and the defendant's Motion to Affirm (Doc. No. 13) is GRANTED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. See 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

Dated this 6th day of February 2020 at New Haven, Connecticut.

  /s/Robert M. Spector, USMJ
 Robert M. Spector
 United States Magistrate Judge